NATIONAL METAL & STEEL CORPO-
RATION, Plaintiff,

v.

The TUG MARINER and Interstate Tow-
ing Co., Inc., Defendants.

No. 45802.

United States District Court,
N. D. California.

May 26, 1971.

**250**

Lillick, McHose, Wheat, Adams & Charles, Graydon S. Staring, San Francisco, Cal., for plaintiff.

Graham & James, Francis L. Tetreault, Paul A. Dezurick, San Francisco, Cal., for defendants.

## MEMORANDUM FOR JUDGMENT

OLIVER J. CARTER, Chief Judge.

This action is before the Court as a result of the grounding and stranding of the naval vessel U.S.S. GEORGE A. JOHNSON on October 12, 1966, on a beach near Pacifica, California. The vessel was being towed by the tug Mariner when the tow line parted and, when efforts to regain the tow failed, the GEORGE JOHNSON went aground. The plaintiff, National Metal & Steel Corporation (hereinafter National Metal) originally brought suit against both Shipowners and Merchants Towboat Co. (hereinafter Shipowners) and Interstate Towing Co., Inc. (hereinafter Interstate). Shipowners was dismissed prior to trial by stipulation of all parties. Interstate owned the tug Mariner at the time the grounding occurred, and they are the sole defendant in the case at bar.

The evidence shows that the plaintiff successfully bid $53,000.00 on a government offer to sell the decommissioned destroyer GEORGE JOHNSON. National Metal desired to remove the vessel from Mare Island to its dismantling yard at Terminal Island in Southern California, and this removal was a condition of the purchase contract. The plaintiff hired, or attempted to hire, Shipowners to perform the towing operation, and Shipowners agreed to undertake the job, quoting a fee of $5,200 for the tow. Shipowners, however, later realized that it did not have a suitable tugboat available and hired, subject to National Metal's approval, Interstate and their tugboat Mariner for the job. Shipowners agreed to pay Interstate $3,200. The plaintiff accepted the Mariner as suitable for the job provided that the tug was approved by their insurance underwriter's marine surveyor. The Mariner was accepted by the surveyor, Captain Healy, and he specified that the "spring" line for the towing cable be anchor chain instead of a nylon line. A "spring" line is used to absorb the shock and stress that is placed on the towing cable during the towing operation. The procedure that was specified was in accordance with the normal practice of the towing industry on the west coast. The captain of the Mariner stated that he preferred to use nylon line instead of anchor chain, but neither demanded that he be allowed to use nylon nor refused the tow if anchor chain was forced upon him. Shipowners provided the anchor chain to Interstate for the tow.

The Mariner left Mare Island on October 12th with the GEORGE JOHNSON in tow, and, approximately four hours later, some ten miles south of the Golden Gate Bridge, the towing cable parted. The crew of the Mariner attempted for five hours, in rough weather, to regain the tow of the floundering vessel. They failed and the GEORGE JOHNSON went onto the beach north of Pacifica due west of Sharps Park golf course.

It is the contention of the plaintiff that the tug Mariner was unseaworthy and that Interstate was negligent in that the vessel was rigged with an inadequate and defective tow line. They allege that the tow line snapped solely because it was worn, defective and unsuitable for the job undertaken. Once the

ship was stranded, National Metal chose to dismantle the GEORGE JOHNSON on the beach rather than attempt to refloat it. The plaintiff states that this decision was motivated by sound theories and was done in good faith and based on the most reliable information available. The expense that was incurred as a result of dismantling the vessel on the beach was considerably more than it would have cost had the ship been taken apart at the plaintiff's shipyard.

The defendant asserts that the tow line on the Mariner was sound and adequate for the job of towing the GEORGE JOHNSON. Interstate contends that the tow line parted because the anchor chain was too heavy for this particular tow and as a result the towing cable was dragged across rocks and other protrusions of the ocean floor. The tow line, defendant urges, parted under this extreme and unnecessary strain. Interstate believes that a nylon line would have been better suited for this tow and that the anchor chain was negligently pressed upon them. The defendant also alleges that the plaintiff had a duty to insure the tug Mariner and Interstate for any unforeseeable occurrence such as this beaching of the vessel. This insurance would protect Interstate from liability to National Metal.

The defendant further contends that once the vessel was grounded the GEORGE JOHNSON could easily have been successfully refloated and towed to a shipyard. The defendant believes that National Metal had a much less expensive avenue open to it and that dismantling the ship on the beach amounted to a failure to mitigate damages, and thus negligence on the part of the plaintiff. The defendant also disputes the expenses plaintiff contends it incurred in the dismantling.

■ The Court concludes that National Metal had no duty, either implied or express, to provide insurance for the defendant. The issue was not raised by a representative of Interstate prior to the voyage and the subject was never a condition to the towing job. Interstate was never given any assurance or even any suggestion that it might be the beneficiary of such a policy.

■ The evidence presented has convinced the Court that the GEORGE JOHNSON broke loose from its tow as a result of a defective and inadequate towing cable. The cable aboard the tug Mariner was either so worn that it could not tolerate the strain that the tow placed upon it or, and it may have been a combination of the two, the cable was allowed to drag across the shallow ocean floor and it snapped because of this constant abrasive action. The anchor chain that was used as a spring was not responsible for the tow line's failure. The makeup for the towing of the GEORGE JOHNSON was in accordance with the general practice of the towing trade and industry. This particular system of towing is used throughout the west coast and it has been efficient and reliable. The captain of the Mariner could have effectively kept the tow line off the bottom if he felt that the chain was holding it down by maneuvering his tug so that the line was more taut. The master of the vessel could also have chosen another route through deeper water. If the route taken had not been through a shallow channel, it is obvious that nothing could have forced the tow line across the rocks on the bottom. The responsibility for the GEORGE JOHNSON passed to Interstate when the tow began, and the defendant cannot shift this burden to someone not in possession of the vessel. The makeup of the tow was entirely proper, and it should have seen the vessel safely to its destination. The tow line was worn, defective and incapable of effecting a proper tow. Interstate was negligent and the tow line made the tug Mariner unseaworthy. The responsibility for the beaching of the GEORGE JOHNSON lies solely with the defendant.

■ Once National Metal became cognizant of the stranding of its ship,

plaintiff immediately began investigating all possible means of eradicating the problems posed by the beached vessel. They were paid, under the terms of their insurance policy, $65,000 as their insurance company considered the GEORGE JOHNSON a total loss. The insurance company took legal title to the vessel and National Metal then repurchased the ship for $1500. The ship was repurchased from their insurance company by the plaintiff because National Metal determined that it could be faced with a multitude of lawsuits if they did not take responsibility for the beached vessel. The plaintiff had agreed to return to the United States government certain items aboard the ship once it had been dismantled. The government informed the plaintiff that it valued these items at $800,000 and would hold National Metal liable if their contractual obligations were not performed and delivery was not forthcoming. The GEORGE JOHNSON contained thousands of gallons of fuel oil and both the cities of San Francisco and Pacifica threatened suits if the oil despoiled the surrounding beaches. All of these agencies placed primary liability for any damages incurred with National Metal. Abandonment was considered, but the plaintiff chose not to expose itself to a plethora of legal battles and this was an entirely proper course to take. The defendant was negligent and Interstate cannot expect the plaintiff to extricate defendant from liability by having National Metal expose itself to a varity of unpleasant litigation. National Metal was under no duty to protect Interstate by abandoning the vessel on the beach.

■ Interstate also asserts that it did not know of the existence of valuable government save items and therefore should not be liable for any expenses incurred after National Metal refused to abandon the vessel and decided to continue performing their contractual obligations with the government. This argument is not particularly viable as nu-merous other considerations were pondered before the ultimate decision was made not to abandon the stranded vessel. The fear of a suit by the federal government was only one of several reasons that kept the plaintiff from abandoning the GEORGE JOHNSON. Interstate agreed to tow the vessel to Terminal Island, and once it allowed the tow to run aground, the subsequent consequences of their negligence must lie with the towing company.

National Metal faced numerous problems once it decided that it had a duty to remove the GEORGE JOHNSON from the beach. Bids were sought in an attempt to see if it was feasible to pull the vessel off the beach and refloat it. The bids that were made varied greatly but all of the bids had one uniform aspect—the job would be accepted by the contractors only on a "no cure-no pay" basis. Under such an agreement the plaintiff had to pay the salvage company only if the GEORGE JOHNSON was successfully removed from the beach. The nefarious aspect of such an agreement is that the salvage company could, *at any time it chose*, abandon its rescue efforts with total impunity. The hazards of such a job were considerable and many contingencies had to be considered. The vessel contained a large quantity of oil and even if it were removed prior to the attempt to refloat the ship, 10% of the oil could not be taken out and it would remain on board. The damage that the oil might do to the seashore was incalculable. One salvage company was not going to remove *any* of the oil. If the GEORGE JOHNSON began to break up during the salvage attempt, the company performing the job could abandon and retreat from the task and all responsibility and liability would fall upon National Metal.

■ The water area surrounding the beached vessel contained numerous rocks and reefs. If the ship ran onto one of these and was sunk during the salvage attempt, the plaintiff would be faced

with numerous lawsuits. But even if National Metal could remove all the oil so that there was no chance of spillage and could have removed all the government save items so that their contractual obligations could be fulfilled, they still had a problem facing them. If the vessel sank, the plaintiff would then still have to refloat the vessel from its far more difficult position of the ocean floor. An independent owner of a ship cannot abandon it if it is wrecked in a navigable channel. In fact the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401–418, makes such an abandonent a crime. Thus, merely removing parts of the ship on the beach would not provide a positive solution to the problem. The only absolutely safe way to remove the GEORGE JOHNSON from its grounded position was to dismantle it at its site on the beach.

National Metal began the dismantling immediately. It obtained the necessary city and county permits, hired equipment, obtained an access road to the ship and brought its own trained and skilled workmen to the jobsite. The job took some six months to complete due to adverse weather conditions, and when the dismantling was completed the beaches were left in exemplary condition.

■ The decision of National Metal to dismantle the GEORGE JOHNSON on the beach was neither capricious nor whimsical. It was rather a judgment decision based on all of the information available to the plaintiff at the time that a decision had to be forthcoming. The plaintiff's desire to save the beach, fulfill their contractual obligations and make certain that the vessel did not sink offshore were legitimate, good faith interests. The ultimate decision of National Metal was reasonable and proper when all alternatives were considered.

The cost of dismantling the GEORGE JOHNSON greatly exceeded the cost of dismantling similar vessels at the plaintiff's shipyard. The cost per ton for the dismantling that was done on the beach was approximately $155 per ton whereas vessels similar in design and tonnage had been taken apart at Terminal Island for only $11 per ton. The direct costs allocated to the job at Pacifica have not been disputed by the defendant. These costs include $25,378.00 for direct labor and $147,140.95 for material and other direct costs. The latter figure includes the cost of "survey and inspection fees" which the Court will award plaintiff as these fees were necessitated and came about as a direct result of the ship being beached.

■ Interstate argues that overhead and administrative expenses should not be recoverable as damages incurred by the dismantling of the GEORGE JOHNSON. Defendant argues that these are normal business expenses and would have been incurred regardless of where the vessel was dismantled. The overhead and administrative expenses were calculated by using the same method that National Metal utilized when conducting their day to day business. The very nature of this unusual job certainly caused an increase in certain expense areas simply because the dismantling itself was more expensive. The production overhead is proper in this case as the men brought from Terminal Island to Pacifica caused a decrease in productivity at the home shipyard. The yard at Terminal Island could not continue to dismantle ships at its normal pace because of the interference imposed by the operation at Pacifica. Workmen were brought from plaintiff's shipyard rather than hiring local labor because plaintiff's own men were proficient at their trade, and expertise was necessary to insure that the operation went well and without mishaps.

The administrative expenses show no allocation of costs that are attributable to direct labor on the job. More administrative efforts were needed on the dismantling of a vessel 300 miles from the

home base of the plaintiff. The application of these expenses is proper, and the Court will award $15,226.80 for administrative expenses and $27,103.71 for overhead. These figures were introduced at trial by the comptroller of National Metal, Mr. Nichols, and by Mr. Rager, the plaintiff's accountant, and a partner in the firm of Peat, Marwick and Mitchell. These figures represent accurate and true costs.

The Court will award only $5,700 to the plaintiff for the cost of shipping the freight from the dismantling site. This represents the actual amount paid out. Any other amount would be based on conjecture and speculation. The Court will reduce the plaintiff's award by $5,200 which was the charge that plaintiff would have incurred as a towing charge had the vessel been delivered to Terminal Island.

The award of damages to plaintiff will be further reduced by $15,993.50. This figure reflects the cost that plaintiff would have incurred had the GEORGE JOHNSON reached the shipyard at Terminal Island and been dismantled there. This figure is arrived at by taking the gross tonnage of the vessel—1450—and multiplying it by $11.03, which is the amount per ton that it cost National Metal to dismantle similar ships at the Terminal Island base.

The plaintiff has prayed for pre-judgment interest on any damages awarded. The Court will not award any pre-judgment interest.

Therefore, the Court determines that the *gross* award to the plaintiff will be $220,549.47. This figure will be reduced by $21,193.50. The total *net* amount of the damages awarded to plaintiff will be $199,355.97.

This memorandum shall constitute the findings of fact and conclusions of law of the Court. Counsel for plaintiff is instructed to prepare and present a judgment in accordance herewith.